DELONE EMERSON BROWN *v.* STATE
OF MARYLAND

[No. 227, September Term, 1968.]

*Decided April 23, 1969.*

*William W. Grant* for appellant.

*Bernard L. Silbert, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Fred A. Thayer, State's Attorney for Garrett County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Delone Emerson Brown, the appellant, was convicted of murder in the second degree in a non-jury trial by the Circuit Court for Garrett County. He was sentenced to a term of 16 years. Brown contends that his written confession was erroneously admitted into evidence.

On February 18, 1968, at about 10:50 P.M., State Trooper Robert Lashley received a call to investigate a stabbing in a tavern in Deer Park. When Lashley arrived he found William

Paugh lying in the middle of the floor of the tavern. He was dead on arrival at the Garrett County Memorial Hospital as a result of two stab wounds in the chest. Lashley continued his investigation by going to the residence of a Mrs. Malcomb. Brown was present at the Malcomb residence, and both voluntarily agreed to go with the police officers to the Sheriff's office. Lashley drove his car, followed by Brown and Malcomb in their car.

At the Sheriff's office, Brown was taken into a room where the State's Attorney, the Sheriff, Deputy Evans, and Lashley were present. The State's Attorney, according to Lashley's testimony, gave Brown the following warnings:

> "A. You introduced yourself as the State's Attorney, you advised him of his rights to remain silent, you advised him of his right to obtain counsel if he wished to do so that he had this opportunity, at anytime we were talking to him, he had a right to not say anything if he did not wish to do so, and that he also was advised that anything that he did say, if he said anything, could and would be used against him in Court.
>
> "Q. Was he advised that if he did not have the money with which to employ an attorney, one would be appointed for him?
>
> "A. Yes, sir.
>
> "Q. Was he then asked physically [1] whether or not he wanted to consult with an attorney?
>
> "A. Yes, he was.
>
> "Q. And what was his reply?
>
> "A. No.
>
> "Q. He did not want an attorney?
>
> "A. No, sir.
>
> "Q. All right, did I then proceed to question him about the events just subsequent—just prior to that time at Bob and Madelyn's Tavern?
>
> "A. Yes, sir."

---

1. Evidently "specifically" intended.

This testimony was corroborated by Evans. Apparently Brown gave only an exculpatory statement at that time. In any event, the next day, Evans drove him to the State Police Barracks at LaVale, a distance of fifty miles, for further interrogation. At the barracks Brown was questioned for an hour by Sergeant Stafford, a lie detector expert of the Maryland State Police. Stafford did not give the *Miranda* warnings because he was informed that Brown had already been given the warnings which, in absence of direct evidence, we must assume to be the warnings of the night before. After one hour of questioning, Stafford turned Brown over to the State's Attorney. Stafford's testimony on the point was as follows:

> "Q. After the interrogation was completed, what did you do then, dictate your recollection of the interview?
> "A. No, sir, I took him back to Mr. Thayer and Lashley and had him repeat it there."

Brown, after warnings, then repeated to the State's Attorney, Evans, and Lashley what he had told Stafford earlier. The interrogation lasted from 4:10 to 4:47 P.M. wherein Brown gave an inculpatory statement. After this, Brown later talked informally to Stafford during Brown's dinner. At 6:15 Brown made more inculpatory additions to his earlier statement.

The warnings given at 4:10 were as follows:

> "Q. What did I tell him this time?
> "A. You told him the same thing, that he was entitled to a lawyer and he could stop at any time on this that he wanted to and he was entitled to a lawyer, and if he couldn't afford one, we'd get him one.
> "Q. Did I advise him of his right to remain silent?
> "A. Yes, sir.
> "Q. Did I advise him that if he did choose to make a statement, it would and could be used against him?
> "A. Yes, sir.
> "Q. Did I make any threats to him?
> "A. No, sir.
> "Q. Did I make him any promises?
> "A. No, sir.

"Q. Did he then give a statement to those of us who were present?

"A. Yes, sir.

"Q. In your opinion did he understand what he was told when he was warned?

"A. Yes, sir.

"Q. Did he make any reply when we asked him if he wanted a lawyer?

"A. No, he said he didn't want any.

"Q. He said he did not want any?

"A. Right.

"Q. All right, were you present when his statement was given?

"A. Yes, sir.

"Q. All right, now after he had concluded his statement, did he then some little while later indicate a desire to make an addition to that statement?

"A. Yes, sir.

"Q. And did he, in fact, add something to it?

"A. Yes, sir, he said that after—

"Q. Now, don't tell what he said—he did—

"A. Yes, sir.

"Q. Between the time that he made the statement and the time that he added to it, did he discuss the case with Sgt. Stafford?

"A. Yeah, I guess so.

"Q. All right, now at the time he made the statement then, he had been twice warned of his constitutional rights and had twice refused an attorney?

"A. That's right.

"Q. And you believed that he understood it?

"A. Yes, sir."

Brown testified that he asked the State's Attorney for an attorney the first night after he had received his *Miranda* warnings, and the next day while he was at LaVale. When Brown returned from LaVale he again asked for an attorney at which time the State's Attorney called one for him, but the attorney refused to accept the case. The State's witnesses testified that

Brown did not ask for an attorney until he returned from La-Vale. The court stated that it believed the witnesses for the State and not Brown, and admitted the statement. Brown contends that it was error to admit his confession into evidence, and we agree.

Although the record shows that Brown was warned on Sunday night and that he waived his right to an attorney at that time, there is no showing that he expressly waived his right to be silent.[2] We do not need to consider whether or not there was an implied waiver of this right, *Brown v. State,* 3 Md. App. 313, 239 A. 2d 761, since that statement was not placed in evidence, and probably had no influence on his subsequent statements. See *Wiggins v. State,* 4 Md. App. 95, 107, 241 A. 2d 424. On Monday he was examined, first by Sergeant Stafford who did not give Brown the *Miranda* warnings, and as far as the record discloses, Brown, at this time, did not waive his right to be silent and did not waive his right to have counsel present.

We quite agree with the cases which hold that the *Miranda* warnings need not be given anew nor the *Miranda* waiver expressed each time the officers question an accused. See particularly *State v. Davis,* 157 N.W. 2d 907 (Iowa 1968) ; *People v. Long,* 69 Cal. Rptr. 698 (1968) ; *Sossamon v. State,* 245 Ark. 302, 432 S.W.2d 469 (1968) ; *Miller v. United States,* 396 F. 2d 492 (8th Cir. 1968). The thread running through these cases, however, shows that both interrogations were conducted by the same officer, or in the same place, or were close together in the point of time, or the statement at the subsequent interrogation was substantially the same as at the earlier inter-

2. The quoted testimony does not clearly show that he was ever warned of his right to have a lawyer present at the interrogation. *Duckett v. State,* 3 Md. App. 563, 240 A. 2d 332. In Deputy Evans' testimony there was a slight indication that he was given such a warning. The written statement as introduced into evidence clearly showed that he received such a warning at that time. This seems to be another example of police officers attempting to testify from memory when a reference to a written record would be much more appropriate. There is an express waiver of his rights in the written statement, but under our holding this came too late.

rogation. The discussion in *Miller v. United States,* 396 F. 2d at 496 is particularly helpful:

> "It is difficult to lay down a rule of general application, and we will not attempt to do so here. In each case, the ultimate question is: Did the defendant, with a full knowledge of his legal rights, knowingly and intentionally relinquish them?
>
> "The circumstances here are such that we believe the trial court was justified in answering these questions affirmatively. The defendant was given a full 'Miranda' warning, in Waukegan, at 11:10 A.M. He signed a written statement between 2:30 and 2:45 P.M. The written statement was prepared by the same officers who conducted the original oral interrogation, and the substance of the two statements were the same."

We think the circumstances in the case at bar did not justify the trial judges' implicit finding that Brown knowingly and intelligently relinquished his constitutional rights. We point to (1) the time lapse, (2) the distance to the location of the second interrogation, (3) the difference in interrogators and (4) to the difference in the statements obtained. We note particularly that after Sergeant Stafford talked with him the second time, at dinner, Brown made even more incriminating statements than he had made prior thereto, i.e. for the first time on the record he admitted actually stabbing the victim. The record does not disclose what Sergeant Stafford said at either interview. One of *Miranda's* strongest teachings is that waiver of constitutional rights cannot be found from a silent record. *Miranda v. Arizona,* 384 U. S. 436, 475, 86 S. Ct. 1602, 1628, 16 L.Ed.2d 694:

> "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley*

*v. Cochran,* 369 U. S. 506, 516, 82 S. Ct. 884, 890, 8 L.Ed.2d 70 (1962), is applicable here:

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' "

384 U. S. 479, 86 S. Ct. 1630:

"After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

Stafford testified that after he had interrogated Brown for an hour Brown "repeated what he told me" to the State's Attorney. As there were no warnings and no waiver, the admissibility of the statement made to Stafford, which was stated to be the same as the one admitted into evidence, was clear error. There was no objection to the admission of this testimony and no motion to strike it from the evidence, but that is not important because we think this improper statement, on these facts, induced the final statement which was the subject of a proper objection.

In *Keller v. State,* 2 Md. App. 623, 236 A. 2d 313 and in *Wiggins v. State, supra,* we reviewed the law as to the admissibility of a statement which follows an invalid statement and stated the rule to be where one statement is found to be involuntary the burden is upon the State to show that the second was not the result of the first. The State did not, and probably cannot, meet the burden; so we must reverse. We need not consider Brown's other contention as to the sufficiency of the evidence.

*Judgment reversed and case remanded*
*for a new trial.*